## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**PHILIP BORRIS,**

        **Plaintiff,**

                             **Case No. 2:20-cv-5664**

    **v.**                        **Judge Edmund A. Sargus, Jr.**

                             **Magistrate Judge Chelsey M. Vascura**

**ENTERPRISE TECHNICAL
ASSISTANCE SERVICES, INC.,**

        **Defendants.**

### OPINION AND ORDER

This matter arises on Defendant's Motion for Summary Judgment. (ECF No. 32). Also disposed of in this opinion is Plaintiff's simultaneously filed Motion for Summary Judgment. (ECF No. 33).

### A. Procedural Background

Plaintiff filed this action in the Southern District of Ohio against Enterprise Technical Assistance Services, Inc. (ETAS) on October 20, 2020. (ECF No. 1). Plaintiff alleged "breach of an oral employment contract and violation of the anti-retaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1)." (ECF No. 1, at 1). Defendant ETAS answered January 15, 2021. (ECF No. 5).

Roughly ten months later, on October 11, 2022, both Plaintiff and Defendant filed their own respective motions for summary judgment. (ECF Nos. 32, 33). Each party responded to their opposition's motion on November 8, 2022. (ECF Nos. 37, 38). Finally, they filed their replies in lockstep on November 29, 2022. (ECF Nos. 41, 42).

### B. Factual Background

Located in Piketon, Ohio are several, now decommissioned, gaseous diffusion plants. (ECF No. 33, at 2). During the Cold War these facilities were used to produce enriched uranium for both civilian and military purposes. (*Id.*). After, these plants found a new purpose. The United States government purchased Soviet nuclear weapons and sent them to the Piketon plants, where the weapons' enriched uranium was converted into fuel for nuclear power. (*Id.*). This continued until 2001, when the Department of Energy (DOE) began the process of decommissioning the facilities. (*Id.*)

To aid them in decommissioning the Piketon plants, the DOE awarded contracts to private contractors. (*Id.*). These companies provided much of the administrative and technical work necessary to the decommissioning process. (*Id.*). In 2002 Philip Borris was employed by Bechtel Jacobs LLC, a private contractor which had assumed the Piketon plant contract, as a site manager for environmental restoration and waste management. (*Id.*, at 4). While in this role, Borris launched a a qui tam action against his employer. (*Id.*). He alleged that Bechtel Jacobs had made false statements to the DOE about the decommissioning process, including false statements that implicated health and environmental safety concerns. (*Id.*).

The DOE chose not to intervene, but Borris and fellow relators pursued the case on the government's behalf. (*Id.*) (ECF No. 38, Exhibit 4, at 31). In July of 2007, Borris' persistence in sustaining this qui tam action bore fruit when the two sides reached a settlement agreement. During the pendency of their case, Bechtel Jacobs lost the Piketon contact. (ECF No. 33, at 4–5). This resulted in Borris losing his employment. (*Id.*, at 8). Another contractor replaced Bechtel Jacobs and refused to hire Borris. (*Id.*). In response, Borris brought an Energy Reorganization Act of 1974 ("ERA") complaint against the contractor, alleging retaliation

against a prospective employee.  (*Id*.).  The Secretary of the U.S. Department of Labor found for

Borris and reinstated him to his old position at the new contractor.  (*Id*.).

Between 2006 and 2019, Borris worked as a health and safety technician and facility

manager at the Piketon site.  (*Id*.).  He retired from the position early in 2019 in order to

maximize his retirement benefits.  (*Id*.).  However, Borris did not intend to permanently retire.

He quickly began applying for jobs at other contractors working in the Piketon site.  (*Id*.).  He

states that he recorded this job search, in a notebook.  (*Id*.).

In 2020, Borris was contacted by an acquaintance, Dan Mosley, who worked as a nuclear

materials manager at the Piketon plant.  (ECF No. 32, Exhibit F, at 5)  Mosley worked for

Enterprise Technical Assistance Services, Inc (ETAS).  (*Id*.).  ETAS is a wholly owned

subsidiary of Tennessee based federal contractor Professional Project Services (Pro2Serve).

(ECF No. 32, Exhibit C, at 12)  Mosley informed Borris that he planned to leave his position

and thought that Borris would be a good replacement.  (ECF No. 33, at 5–6)  Borris applied for

the job, but his application was rejected after Mosley chose to stay in his position.  (ECF No. 32,

Exhibit F, at 7).

In July of 2020 Borris was contacted by Talmon Larmee, a Pro2Serve recruiter.  Larmee

informed Borris of a position, titled Process Engineer/Facility Specialist III, with ETAS at the

Piketon site.  (ECF No. 32, Exhibit 3, at 34)  Borris interviewed with Stephen Mee, the ETAS

hiring manager.  (ECF No. 32, Exhibit H, at 28)  Email communications between Mee and

Larmee indicate that Borris's interview went well.  (*Id*., Exhibit C, at 69)  They also show Mee

asking Dennis Dalga, ETAS's Piketon site manager, for permission to extend an offer of

employment to Borris, that Dalga did in fact authorize such an offer, and that Mee directed

Talmon to draft an offer letter to Borris.  (*Id*., at 69–72).  Further, Talmon stated that he would extend an offer of employment.  (*Id*.).

Talmon called Borris to inform him of the offer on July 30, 2020.  (*Id*., at 73–74).  Borris's notes, supported by his recollection of the conversation, indicate that Larmee offered Borris the Process Engineer/Facility Specialist III position and that the offer included all essential terms. (ECF No. 32, Exhibit 3, at 59).  The only conditions Borris recollects Larmee placing on the job were that it was contingent on passing the background investigation and a drug screen.  (ECF No. 32, Exhibit 3, at 59).  Larmee also remembers telling Borris about the investigation and screen.  (ECF No. 32, Exhibit C, at 29).  However, he also remembers informing Borris that the job was "subject to senior management approval.  (*Id*.).  Under any version of the facts, Borris accepted immediately.  (*Id*.)

## C.  Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fᴇᴅ. R. Cɪᴠ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). It is with this standard in mind that the instant motion will be decided.

The moving party bears the burden of production first. "The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party then must present sufficient evidence from which a jury could reasonably find for her. *See Anderson Liberty Lobb y, Inc.*, 477 U.S. 242, 249 (1986). The court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### D. Analysis

### a. Breach of Contract Claim

Both parties contend that they are entitled to summary judgment on Plaintiff's breach of contract claim, Count One. (ECF Nos. 32, 33).

### i. Existence of a Contract

Defendant argues it is entitled to judgment because it did not enter into a contract with Borris, stating Borris' "breach of contract claim fails as he is unable to prove there was a meeting of the minds or mutual consideration was present." (ECF No. 32, at 11). Plaintiff, on the other hand, argues that "[t]here is no genuine dispute of in material fact that ETAS – at DOE's behest – breached its employment agreement with Borris due to his prior whistleblower activity" by repudiating its existent employment contract with him. (ECF No. 33, at 4). Both parties harness the record to show their indisputable entitlement to summary judgment. However, the Court finds a dispute of material fact, and denies both motions accordingly, as described below.

The first question before the Court is whether a contract between the parties exists.

"A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty. *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631, 691 N.E.2d 303 (4th Dist.1996). 'To successfully prosecute a breach of contract claim, a plaintiff must present evidence of (1) the existence of a contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract, and (4) plaintiff's loss or damage as a result of defendant's breach.' *Barlay v. Yoga's Drive-Thru*, 10th Dist. No. 03AP-545, 2003-Ohio-7164, ¶ 6, citing *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (2d Dist.1994)."

*Phu Ta v. Chaudhry*, 10th Dist. No. 15AP-867, 2016-Ohio-4944

"To prove the existence of a contract, written or oral, 'a plaintiff must show that both parties consented to the terms of the contract, that there was a 'meeting of the minds' of both

parties, and that the terms of the contract are definite and certain.'' *Id.* (Internal citations omitted). The law in Ohio enforces verbal employment contracts "purporting to be permanent or for life, or for no fixed time period" in the same manner as contracts that are "employment terminable at the will of either party." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1040 (6th Cir. 1992). To be admissible at the summary judgment stage, the Federal Rules of Civil Procedure require affidavits and declarations to set out facts that would be admissible in evidence at trial. FRCP 56(c)(4). Here, the parties disagree over whether there exists evidence to establish a meeting of the minds.

Plaintiff alleges that a meeting of the minds occurred when, on July 30, 2020, "Talmon Larmee made an oral offer of employment on behalf of ETAS to Borris – which Borris orally accepted – for the full-time Process Engineer position at $46.10/hr with a start date of August 17, 2020." (ECF No. 33, at 15). As evidence of this offer, Plaintiff points to his own recollection, recorded notes of the offer, and an internal ETAS email chain. (*Id.*). Defendant acknowledges that Talmon Larmee discussed employment with Borris on July 30. However, it denies that Larmee ever made a formal offer. Instead, Defendant characterizes Larmee's statement to Borris as "a verbal conditional offer," "conditional upon a background check, drug testing, and senior management approval." (ECF No. 41, at 2). These conditions were never fulfilled so, Defendant argues, no employment contract was ever created. Defendant further states "Larmee and Borris did not have a meeting of the minds on the existence of an essential element of the conditional offer; the requirement that Borris possess a four-year degree." (ECF No. 38, at 23).

Plaintiff's attached affidavit details his acceptance of Larmee's offer of employment. (ECF No. 33, Exhibit 1, at 4). The testimony contained within the affidavit related to this offer and acceptance will be admissible in trial. This is because:

> "[t]he statements constitute[s] part of the verbal act of contract offer and acceptance of the type that is excluded from the definition of hearsay. *Preferred Properties, Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 798 n.5 (6th Cir. 2002) ('The verbal acts doctrine applies where legal consequences flow from the fact that words were said, e.g. the words of offer and acceptance which create a contract.'' (quoting Black's Law Dictionary 1558 (6th Ed. 1990)))"

*Acree v. Tyson Bearing Co*., 128 F. App'x 419 (6th Cir. 2005).

The email chain which Plaintiff has pointed to will also be admissible at trial. (ECF No. 33, Exhibit 9, at 13). Conversely, Larmee's version of the event will also be admissible at trial. The Court finds that both parties have produced enough evidence to satisfy their burden[1].

Further, this case is distinguishable from *Baker v. Northwest Hauling,* 2003 WL 2148619 (June 30, 2003). There, like here, the plaintiff was offered a position, conditioned on her performing some additional task. For the plaintiff in *Baker* that task was to complete a physical. In anticipation of working this new job, the plaintiff quit her old one. However, the day of the physical, the plaintiff was informed that the offer had been revoked. The district court found there to be no contract. The court came to this conclusion because of language contained in the plaintiff's application agreement. The language is as follows: "I understand that nothing contained in the application or conveyed during any interview which may be granted is intended to create an employment contract between me and the Company." *Baker v. Northwest Hauling*. In *Baker*, the applicant was explicitly informed that they had no employment contract. Here, Borris denies such understanding. And while Borris acknowledges he was told that his employment was conditioned on a background check and drug testing, he argues credibly that those measures were mere formalities, rather than essential requirements. Further, as to both a

---

[1] As mentioned above, Plaintiff has produced a notebook in which he recorded "lists of applications and his immediate recollections and impressions of interviews and conversations." (ECF No. 33, at 5). Defendant has challenged the admissibility of the book and the statements contained within. (ECF No. 38, at 15). The Court need not determine the admissibility of the notebook to decide the question before it.

drug test and background check, neither were discretionary; both were better known subjects to Borris rather than to Defendant.

### ii. Apparent Authority and Miscellaneous Issues

In the alternative, Defendant argues that it was not reasonable for Plaintiff to believe that it had formed an employment relationship with him. It states "(1) no employment contract was formed because Larmee lacked actual authority to enter into such an agreement and there was no mutual consideration, (2) because the employment was at will, his claim for breach fails as a matter of law, and (3) where he never reported for work there was no employment relationship such that a claim under FCA also fails.[2]" (ECF No. 32, at 13). Plaintiff disagrees on all points. (ECF No. 37, at 9). The Court will take each of these arguments in turn.

"It is a principle of agency law that an agent, acting within the scope of his actual authority, expressly or impliedly conferred, can bind the principal." *Damon's Missouri, Inc. v. Davis*, 590 N.E.2d 254, 257 (Ohio 1992). However, even if an agent lacks the actual authority to bind their principal, they may still have apparent authority to do so.

> An agent can also bind a principal to a contract if the agent has apparent authority to bind the principal. Apparent authority is the "power to affect the principal's legal relations by transactions with third persons arising from the purported principal's representations to such third persons." 1 CV Ohio Jury Instructions 423.01 cmt. 7. For a principal to be bound by an agent under the theory of apparent authority, the evidence must show that: (1) "the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Master Consol. Corp.*, 575 N.E.2d at 822 (citations omitted).

---

[2] While Defendant mentions this last point in a section of its motion dedicated to Plaintiff's breach of contract claim, this specific argument is not actually relevant to that claim. (ECF No. 32, at 13). Instead, it applies to Plaintiff's False Claims Act (FCA) action. As such, the Court will analyze Defendant's last argument in that section of the opinion.

*Hannibal Dev., LLC v. Lackawanna Transp. Co.*, 2021 WL 3398973, at *6 (S.D. Ohio Aug. 4, 2021.

Plaintiff contends that Talmon Larmee and Stephen Mee had such authority.  He states "ETAS's management held out to the public Talmon Larmee and Stephen Mee as the persons authorized to make the Process Engineer position hire." (ECF No. 33, at 17).  Plaintiff argues ETAS did so by designating "Talmon Larmee as ETAS's recruiter for the Process Engineer position on the online job posting that Borris applied to," by holding out "Stephen Mee as the hiring manager by having Borris only interview with him," and by not disclosing to the public ETAS's policy that offer letters must be "approved by David Allen or Mark DeGraff prior to an offer being made." (*Id.*).  Defendant counters by contesting the second element of the apparent authority test.[3]  It states, "Plaintiff was aware that the offer was conditioned on senior management approval and issuance of a written offer, which did not occur." (ECF No. 38, at 27).

This Court finds that there is a genuine issue of material fact as to whether ETAS held out Larmee and Mee as having sufficient authority to make Borris an offer of employment.  Plaintiff has presented evidence that he understood Larmee's title at Pro2Serve to be "senior recruiter," a role which indicates Larmee's principal has given him at least some authority in the hiring process.  (ECF No. 32, Exhibit 4, at 8); (ECF No. 32, at 7); (ECF No. 32, Exhibit 1, at 4); (ECF No. 32, Exhibit G).  Similarly, Mee's title[4] also connotes authority to manage the hiring process and make offers of employment.

---

[3] In its Motion for Summary Judgment, Defendant briefly contests the first element of the apparent authority test. (ECF No. 32, at 13).  However, Defendant fails to develop this argument.
[4] Stephen Mee is variously referred to as either "the Vice President for Pro2Serve" and "a recruiter," (ECF No. 32, at 7) or a "hiring manager" (ECF No. 32, Exhibit 4, at 19).

"[A]pparent authority can be created by appointing a person to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent." Restatement 2d of Agency § 27 Cmt. A.  This Court found in *Hannibal* that a person's title "as general manager of [their company] would have authority bind [a division of the company] to a contract." *Hannibal Dev., LLC v. Lackawanna Transp. Co*., 2021 3398973, at \*6 (S.D. Ohio Aug. 4, 2021).  A title of vice president or hiring manager tends to connote similar authority. Further, unlike the plaintiff in *Hannibal*, Borris has presented evidence that he knew of these facts.  (ECF No. 33, Exhibit 1, at 4); (ECF No. 32, Exhibit G, at 2-10).

Finally, as mentioned above, there is a dispute of material fact as to whether Larmee informed Borris that the July 30 offer was conditioned on senior management approval.  Larmee states that he did, while Borris states that he did not.  Both parties have produced admissible evidence in favor of their version of events.  (ECF No. 32, Exhibit 4; ECF No. 33, Exhibit 1).

As to the second element of the apparent authority test, the Court finds another genuine issue of material fact.  While Defendant argues, "Plaintiff was aware that the offer was conditioned on senior management approval and issuance of a written offer, which did not occur," the record reflects disagreement on this point. (ECF No. 38, at 27).  Larmee does state in his affidavit that he informed Plaintiff of this requirement. (ECF No. 32, Exhibit 4, at 73).  But Plaintiff, through his own affidavit, recollects that the offer was unconditional.  (ECF No. 33, Exhibit 1, at 4).  The Court cannot weigh the strength of the parties' evidence.  As both affidavits are admissible through Rule 801(d)(2) of the Federal Rules of Evidence, there is a genuine issue

of fact as to Plaintiff's knowledge and good faith in accepting Larmee's offer.  Thus, neither party is entitled to summary judgment on this point.

Defendant's next argument for dismissal is that "(2) because the employment was at will, [Plaintiff's] claim for breach fails as a matter of law."  (ECF No. 32, at 13).  This argument is misplaced.  Defendant is correct that, assuming Borris and ETAS had a contract, the contract was at-will.  (ECF No. 32, at 18).  However, it is incorrect that the at-will nature of Borris' employment precludes him from bringing his breach of contract claim.

It is well settled under Ohio law that "[u]nless otherwise agreed, either party to an oral employment-at-will agreement may terminate the relationship for any reason which is not contrary to law." *Hartley v. Dayton Computer Supply*, 106 F. Supp. 2d 976, 988 (S.D. Ohio 1999) citing *Mers v. Dispatch Printing Co*., 19 Ohio St.3d 100, 483 N.E.2d 150 (1985).  Here, Plaintiff alleges that Defendant terminated their employment relationship for his past whistleblower activity.  (ECF No. 33, at 1).  As Plaintiff points out, such an action would be against numerous federal laws.  31 U.S.C. § 3730(h)(1). 41 U.S.C.A. § 4712. 42 U.S.C.A. § 5851.

Defendant denies terminating Borris' employment due to his past whistleblower status and argues that Plaintiff has produced no evidence that it did so.  (ECF No. 38, at 1).  It states "ETAS' reason for non-hire was Borris' lack of a four-year degree, a DOE requirement."  (ECF No. 32, at 18).  However, Plaintiff contends that the facts indicate "ETAS repudiated its employment contract with Borris because DOE did not want him to work on the ETAS contract due to his prior whistleblower activity."  (ECF No. 33, at 20).  Plaintiff points to the following evidence in favor of his theory:

12

"An email exchange between DOE employees Matt Vick and Zachary Lafontaine at the PPPO office dated July 22, 2022 show DOE employees were aware Borris was applying for the Process Engineer position. Vick Dep. Ex. 1."

"On Tuesday, August 4, 2020 at 9:19 a.m., Stephen Mee asked Mark DeGraff and David Allen to sign the offer letter because he felt Borris was best suited for the Process Engineer position. Mee Dep. Ex. 16."

"August 4, 2020 phone logs from Stephen Mee, David Allen and Mark DeGraff show that neither called Stephen Mee on that day. Deft. ETAS Resp. to Pl. 2nd Req. for Prod. of Docs. p. 8-10. Verizon Subpoena Resp. p. 10, 11"

"Yet, on August 12, 2020, Stephen Mee in an email chain about Borris said to Matt Vick, "I was prepared to offer [Borris] the position until a bird flew in from LEX and explained why I was incorrect in my judgement." Mee Dep. Ex. 19."

"Further, on August 5, 2020, Talmon Larmee in an email chain about Borris said to an ETAS employee, "I got word late [August 4, 2020] that [Borris] didn't get client buy in." Larmee Dep. Ex. 18."

"Borris' testimony and the Notebook recollections show Talmon Larmee said on August 5, 2020 that Stephen Mee told him late August 4, 2020 that Borris was not permitted to work on the ETAS contract. Borris Aff. ¶ 21. Ex. 2."

"Borris' testimony and the Notebook recollections shows Dan Mosley said on August 5, 2020 that David Allen told him that the reason Borris was not permitted on the ETAS contract was because of his history of whistleblowing. Borris Aff. ¶ 23. Ex. 2."

(ECF No. 33, at 20–21).

Some of Plaintiff's evidence is inadmissible at trial and, as such, will not be considered at the summary judgment stage. This includes Plaintiff's last paragraph, in which Borris reports that Mosley informed him he was terminated due to his whistleblower history. Mosley's statements are hearsay. Under Plaintiff's version of the facts, Allen made these statements to Mosley, who then repeated them to Borris. (ECF No. 33, at 11–12). While Allen's statement to Mosley may have been an admission of a party opponent, Mosley's recitation of those statements to Borris were not. At the time he made those statements, Mosley was a subcontractor of ETAS working as a nuclear material manager. (*Id.*, 5–6). His statement about Plaintiff's employment was not in the

scope of his employment as a nuclear material manager, and therefore does not qualify as an admission of a party opponent.  (*Id*.).  Further, Plaintiff has presented no evidence that Mosley is a party opponent, despite Defendant explicitly arguing this point in their Response.  (ECF No. 38, at 18).  Mosley's statements are inadmissible under the Admission of Party Opponent exclusion.

However, while some of Plaintiff's evidence is inadmissible, he has produced enough to survive summary judgment.  There is a material question of fact as to who the "client" was and why Borris did not get client buy in.  Plaintiff has produced evidence that the DOE was aware of his whistleblower history, that ETAS was prepared to, or did, offer him a position, and that ETAS changed their mind.  He has also produced evidence which indicates ETAS did so after receiving word from an unnamed person in Lexington Kentucky, where their DOE client was located.

On the other side, Defendant has also produced evidence supporting their version of events.  Defendant's affidavits indicate that Mark DeGraff, a Program Manager at ETAS, was the "client" who flew in from Lexington to repudiate Borris's offer.  Further, Defendant has pointed out that the position for which Borris was to be hired required a 4-year degree and stated that Borris's lack of degree was the reason ETAS passed on him.  While Plaintiff contests this necessity and has produced evidence to that shows this requirement could be bypassed, there remains an issue of fact as to how relevant Borris' lack of degree was to ETAS's decision.  Neither party can "make a showing sufficient to establish the existence of an element that is essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### b. False Claims Act Retaliation Claim

Both parties contend that they are entitled to summary judgment on Plaintiff's False Claims Act Retaliation (FCA) claim. (ECF Nos. 32, 33).

Defendant argues Plaintiff's FCA claim fails for a number of reasons. First, Defendant contends "where [Plaintiff] never reported for work there was no employment relationship such that a claim under FCA also fails." (ECF No. 32, at 13). Plaintiff's response addresses this argument only briefly, stating "Borris entered into an at-will employment agreement with ETAS via Talmon Larmee's apparent authority, so the FCA retaliation provision is applicable." (ECF No. 37, at 9). As support, Plaintiff cites generally to *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056 (6th Cir. 2014). (*Id*.). However, Plaintiff's reply to Defendant's response to his own motion for summary judgment fleshes this argument out. There, Plaintiff argues

> "The Sixth Circuit has an expansive definition of the word employee to 'extend protection to 'individuals who [a]re not technically employees within the typical employer-employee relationship, but nonetheless have a contractual or agent relationship with an employer.'' [*Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056 (6th Cir. 2014)] That Borris was hired but had not started work provides standing for FCA anti-retaliation protections. Yet, ETAS attempts to contort basic contract law to avoid Borris' FCA anti-retaliation protections."

(ECF No. 42, at 11).

The Court finds merit in Plaintiff's argument. Earlier, the Court found an issue of material fact as to existence of a contractual agreement between Borris and ETAS. As such, while it is uncontroverted that Borris never worked a day at ETAS and never received a salary from it, the question of their contractual relationship is in dispute. The Court in *Vander Boegh*, was clear that the FCA's protection extends to "individuals who [a]re not technically employees within the typical employer-employee relationship, but nonetheless have a contractual or agent relationship with an employer." *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063

15

(6th Cir. 2014).  Borris had a contractual relationship with ETAS, and was therefore covered by the FCA's protection.

Borris is distinguishable from the plaintiff in *Vander Boegh*.  There, the plaintiff was a job applicant who was passed over for a position at a gaseous diffusion plant.  The plaintiff felt he was being discriminated against due to his prior whistleblowing and sued.  The circuit court held that, despite the FCA's liberal interpretation of the word "employee," its protections did not extend to applicants.  Here, Borris is not just a mere applicant.  There is an issue of fact surrounding the existence of an oral employment contract between him and ETAS.  This is the exact type of relationship the court in *Vander Boegh* stated was within the FCA's expanded protection.

Further, the instant case is also distinguishable from *Nationwide Mutual Insurance Co. v. Darden*.  There, when deciding an Employee Retirement Income Security Act claim, the Supreme Court held that the term "employee" refers to the master-servant relationship as defined by common-law agency doctrine.  *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323.  The Court reasoned that "ERISA's nominal definition of 'employee' as 'any individual employed by an employer,' 29 U. S. C. § 1002(6), is completely circular and explains nothing." *Id*., at 323.  Thus, the Court turned to the statute for guidance, but was unable to find "any provision either giving specific guidance on the term's meaning or suggesting that construing it to incorporate traditional agency law principles would thwart the congressional design or lead to absurd results."  *Id*.  Absent Congressional indication of the proper test for what is an "employee", the Court reasoned "where Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."  *Id*., 322.   As the

16

common law meaning of employee connotes a "master-servant relationship," the Court reasoned that this was the appropriate definition. *Id*., at 323.

Defendant argues the master-servant definition of employee should apply to claims under the FCA as well. This Court disagrees. In contrast to the statute in *Darden*, Congress has indicated through legislative history what "employee" means in relation to the FCA. As the Sixth Circuit explained in *Vander Boegh*, "Congress amended the FCA to correct recent court decisions that denied FCA retaliation protection to persons in employment-like relationships that were not technically 'employees' because Congress found the decisions unduly narrow." *Vander Boegh v. EnergySolutions, Inc*., 772 F.3d 1056, 1063 (6th Cir. 2014). As such, the definition of employee is much more expansive in FCA claims than in ERISA claims. Congress has made its intent clear, the sixth circuit has interpreted that intent, and this court is bound to follow it. Defendant's argument fails.

Defendant next argues that "even if Borris were hired, he has no claim for breach of contract arising from ETAS's refusal to honor the unauthorized contingent offer, for which there was no consideration." (ECF No. 32, at 18). Defendant's argument fails for the same reason it failed on Plaintiff's breach of contract claim. "Unless otherwise agreed, either party to an oral employment-at-will agreement may terminate the relationship for any reason which is not contrary to law." *Hartley v. Dayton Computer Supply,* 106 F. Supp. 2d 976, 988 (S.D. Ohio 1999) citing *Mers v. Dispatch Printing Co*., 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). Here, there is a dispute of fact as the existence of an employment contract and the reason for which it was terminated. Plaintiff argues the contract was terminated for a reason contrary to law, while Defendant, assuming that the parties had a contract at all, denies this. Both have produced admissible evidence in favor of their version of the facts.

17

Defendant's argument that a lack of consideration should preclude Plaintiff's FCA claim is similarly inapposite. (ECF No. 32, at 13). As Plaintiff points out, a set of mutual promises can serve as each other's consideration. (ECF No. 42, at 11). "'Thus, mutual promises to employ and to be employed on an ongoing at-will basis, according to agreed terms, are supported by consideration: the promise of one serves as consideration for the promise of the other.'" *Becker v. Rapidigm, Inc*., No. 1:03CV875, 2005 WL 2397672, at *6 (S.D.Ohio Sept.28, 2005) quoting *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 804 N.E.2d 27, 28 (Ohio 2004). This law is well settled. As such, Defendant's argument fails.

Defendant's final argument is that "Borris' FCA claim must fail as there is no evidence of pretext.." (ECF No. 32, at 18). However, as discussed in the section above, Plaintiff has shouldered his burden and produced evidence showing a genuine issue of material fact on this issue. Thus, Defendant is not entitled to summary judgment on Plaintiff's FCA claim. As Plaintiff has not shown he is entitled to a verdict in his favor as a matter of law, he is not entitled to summary judgment on the FCA claim either.

### c. Requests for Admission

Plaintiff argues that he is entitled to summary judgment on both of his claims because the "admissible evidence proves ETAS repudiated its employment contract with Borris due to his past whistleblower activity." (ECF No, 42, at 2). He states in his reply brief that, "ETAS admitted Mark DeGraff never called Stephen Mee and cannot be the 'bird [that] flew in from LEX'. (*Id*., at 2). In support of this contention, Plaintiff points to Defendant's answers to two Requests for Admission. These requests and Defendant's answers are as follows:

"**REQUEST FOR ADMISSION NO. 1**: Admit neither David Allen nor Mark DeGraff called, video called, emailed, or messaged Stephen Mee on August 4, 2020 or August 5, 2020.

**ANSWER**: As explained in prior discovery requests that were served at the same time as these Request to Admit, Defendant ETAS does not have Verizon phone records for this time period and that such records are required to be subpoenaed pursuant to Verizon policy. Based upon a diligent search, and because Defendant ETAS does not have phone records for the time period referenced for Mark DeGraff, Defendant ETAS cannot admit nor deny this request at this time. Once the records are received, Defendant ETAS will supplement this response. As to David Allen, and after a diligent search, this request is admitted.

**REQUEST FOR ADMISSION NO. 4**: Admit neither David Allen nor Mark DeGraff are the person Stephen Mee referred to as a "bird" in his August 12, 2020 email to Matt Vick when he stated, "I was prepared to offer him the position until a bird flew in from LEX and explained why I was incorrect in my judgment".

**ANSWER**: Defendant ETAS denies as untrue the Request to Admit. Mark DeGraff is the person referred to as "bird.""

(ECF No. 33, Exhibit 5, at 3–4).

Plaintiff maintains that these two admissions require the Court to grant summary judgment in his favor. His argument focuses on the Verizon subpoenas discussed in Defendant's first answer. He states "ETAS' answer to Request for Admission No. 1 states the only reason ETAS could not admit or deny was because it lacked the Verizon subpoena. Once ETAS' counsel received the Verizon subpoena, by its own representation it obtained the information to admit or deny Request for Admission No. 1." (*Id*., at 3). Thus, Plaintiff contends, "Request for Admission No. 1 should be considered admitted due to a lack of answer." (*Id*.). If Request for Admission No. 1 is admitted, then "ETAS' denial of Request for Admission No. 4 becomes untenable since Mark DeGraff could not be the 'bird' if he did not call Stephen Mee on August 4th." (*Id*.).

The Court rejects Plaintiffs' argument for two reasons. First, Plaintiff brought it up only in his reply. Local Rule 7.2 (d) states "Evidence used to support a reply memorandum shall be

limited to that needed to rebut the positions argued in memoranda in opposition." Defendant's response in opposition did not mention the requests for admission. (ECF No. 38). And nowhere in Plaintiff's original motion for summary judgment or his response to Defendant's motion for summary judgment does Plaintiff mention the requests for admission. (ECF No. 33, 37). As such, Defendant was not afforded the opportunity to brief this point.

Second, the Court rejects Plaintiff's interpretation of Admission No. 1's answer. Defendant's failure to supplement its answer to question one does not necessarily indicate that Defendant admits Mark DeGraff did not call Stephen Mee on August 4. Even with the specifically subpoenaed Verizon records, Defendant still may not have enough information to answer question one. Defendant never claimed to have subpoenaed all records of all calls to and from Mee from all possible devices. As Defendant points out, the subpoenaed "phone logs do not exclude other ways Mee and DeGraff communicated." (ECF No. 41, at 11–12). Thus, it may still be true that "[b]ased upon a diligent search, and because Defendant ETAS does not have" *all of the* "phone records for the time period referenced for Mark DeGraff, Defendant ETAS cannot admit nor deny this request at this time." (ECF No. 33, Exhibit 5, at 4). The Court rejects Plaintiff's argument. Plaintiff is not entitled to summary judgment on these grounds.

### E.  Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary

Judgment.  (ECF No. 32).  Also **DENIED** is Plaintiff's Motion for Summary Judgment.

(ECF No. 33).   This case is to remain open.

**IT IS SO ORDERED.**


<u>**6/13/2023**</u>                                    <u>**s/Edmund A. Sargus, Jr.**</u>
**DATE**                                       **EDMUND A. SARGUS, JR.**
                                               **UNITED STATES DISTRICT JUDGE**